## NATIONAL LIFE INS. CO. v. PERKINS.

### No. 2486.

Court of Civil Appeals of Texas. Waco.
Feb. 4, 1943.

Rehearing Denied April 15, 1943.

See, also, 152 S.W.2d 478.

Read, Lowrance & Bates, of Dallas, and F. L. Henderson, Coulter Hoppess, and Arthur Stewart, all of Bryan, for appellant.

John R. Grace, of Hearne, for appellee.

HALE, Justice.

Appellee Perkins sued appellant, National Life Insurance Company, for the recovery of commissions alleged to be due him in connection with the sale of 476 acres of land to Gifford-Hill & Company. Upon the conclusion of the testimony appellant presented its motion for a peremptory instruction, which was overruled. Thereupon the court submitted certain special issues to the jury, in response to which the jury found that the parties had entered into a contract by the terms of which appellee would receive a commission on the value of the gravel, sand and ballast content of the land in question in event the services performed by him "were the procuring cause of the sale of the total real estate to a purchaser"; that the services performed by appellee in connection with the sale of the land to Gifford-Hill & Company were the procuring cause of the sale; and that $1,884.96 was the sum of money, if then paid in cash, to which appellee was entitled for his services in connection with the sale. Appellee moved for judgment on the verdict and appellant moved for judgment non obstante veredicto. The court overruled the motion of appellant, granted the motion of appellee, and rendered judgment for the sum found by the jury, and hence this appeal.

Appellant says the trial court erred in overruling its motion for a directed verdict and its motion for judgment non obstante veredicto, because: (1) the only contract proved by appellee was one by which appellant agreed to pay him for his aid in selling a sand and gravel lease, for which he received full payment; (2) appellee adduced no competent evidence of probative force to show that he was employed by appellant to aid in the sale of the land or its sand and gravel content; and (3) appellee adduced no evidence to show that he rendered any service in effecting the sale of the land to Gifford-Hill & Company or as to what would be reasonable compensation for such service. It therefore contends that the judgment of the trial court should be reversed and that judgment should be here rendered in its favor. On the other hand, appellee contends that the evidence was sufficient to sustain the verdict and consequently the judgment appealed from should be affirmed.

In passing upon the foregoing contentions it is the duty of this court to view the record before us in its most favorable light from the standpoint of appellee. Besteiro v. Besteiro, Tex.Com.App., 65 S.W. 2d 759. When thus viewed, if there was no evidence of probative force raising one or more of the ultimate fact issues found by the jury, then the judgment appealed from should be reversed; but if there was competent evidence of probative force raising such issues, then the judgment should be affirmed. Wichita Falls & O. R. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79.

Neil Thomason testified that he was manager of appellant's investment department and as such had charge of the disposition of its real estate subject to the approval of the home office; that the land here involved was known as the Camp farm and was acquired by appellant in 1933; it was his duty to find a buyer or lessee for the farm and before contacting appellee he had tried unsuccessfully to sell or lease the same to Gifford-Hill & Company, who was engaged in the gravel business; he had known appellee for about ten years, during a part of which time appellee was engaged in operating a gravel pit near the Camp farm; extensive tests made on appellant's farm for gravel prior to 1935 did not "show up very favorably" or indicate the presence of gravel in commercial quantities; in the early part of 1935 he had a conversation with appellee with respect to the possibility of getting gravel operations started on the Camp farm; and that he thought appellee could help him make a sale or lease of the property to someone.

Appellee testified, in substance, that Thomason approached him in the early part of 1935 concerning gravel operations

on the Camp farm, and at that time he agreed to "work out a proposition with him to handle his gravel operations and dispose of it on some percentage basis"; he and Thomason later agreed upon a basis of fifteen per cent commission; he explained to Thomason fully and in detail at the time of their agreement how he expected to proceed in his efforts to consummate the proposed transaction; after the verbal agreement had been entered into he took a crew of men out on the Camp farm and made extensive tests by which he discovered and later demonstrated to an engineer for Gifford-Hill & Company the presence of gravel in commercial quantities on about 45 acres of the farm; thereafter, when it became apparent that a favorable lease contract would be entered into between appellant and Gifford-Hill & Company, Thomason requested him to reduce the amount of his commissions to ten per cent, which he agreed to do; he made three or four trips to Dallas prior to May 27, 1935, for the purpose of conferring with Thomason in regard to the project; and that the ten per cent commission was to apply to "any money that was derived from the sale of sand and gravel from that Camp farm." In response to a specific question from his counsel as to whether his conversations and negotiations with Thomason related only to a lease contract, or to a disposition of the sand and gravel under the Camp farm, appellee testified: "I would receive a commission on all the sales relative to sand and gravel, or the sale of sand and gravel on the farm in any manner."

On May 27, 1935, appellant entered into a written lease contract with Gifford-Hill & Company, by the terms of which it leased the Camp farm for ten years, and so long thereafter as marketable sand and gravel might be available in paying quantities not to exceed twenty years, in consideration of certain royalties to be paid on the sand and gravel removed therefrom; provided, however, that if the lessee should not begin operations within a period of ninety days from the effective date of said lease, it should pay to appellant $200 per month as guaranteed advanced royalty until operations were started. Lessee paid to appellant the sum of $200 per month until on or about September 8, 1938, at which time the lease contract was merged into and terminated by a comprehensive written contract of sale between the parties. Thereafter, on December 12, 1938,

appellant conveyed the Camp farm, less a reserved one-fourth interest in the gravel and sand, to Gifford-Hill & Company for a consideration of $35,000 in accordance with the contract of sale. The consideration included a credit of $2,000 for advanced royalty payments previously made under the prior lease. The contract of sale and deed of conveyance each provided for further credits on prior advanced royalty payments, dependent upon the amount of future royalty payments to be made by grantee under a schedule of royalties covering the interest reserved by grantor in and to all gravel to be mined and removed from said land. Appellant paid to appellee as earned commissions under the lease contract the sum of $20 per month during the continuance of the lease but refused to pay any further commissions on the consideration for the sale and conveyance. There was evidence tending to show the value of the Camp farm for agricultural purposes and its additional value attributable to sand and gravel deposits which was sufficient to warrant the jury in concluding therefrom that the reasonable value of the sand and gravel content of the land conveyed was in excess of the sum of $18,849.60.

In our opinion the evidence to which we have referred, if admissible and competent, was sufficient to raise and sustain the findings of the jury. Appellant insists, however, that all parol testimony as to the terms of the contract sued upon was inadmissible, incompetent and wanting in probative force because the prior verbal negotiations and agreements between the parties were merged into a written contract consisting of certain letters, and the necessary effect of considering such parol testimony was to vary and add to the terms of the written contract, contrary to law.

It is generally held that where the parties have reduced to writing that which upon its face appears to be a complete and certain agreement, the courts will conclusively presume, in the absence of fraud, accident or mistake, that the writing contains the entire agreement, and under such circumstances parol evidence of prior negotiations, conversations or statements will not be accepted for the purpose of adding to or varying the written instrument. Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977. On the other hand, where the writ-

ing is incomplete, uncertain or ambiguous, parol evidence is admissible and competent to explain the same or to ascertain the true intention of the parties in so far as such intention is consistent with the writing. Higginbotham Cattle Co. v. Whaley & Lewis, Tex.Com.App., 41 S.W.2d 34. Moreover, "even though a written contract be unambiguous on its face, parol evidence is admissible for the purpose of applying the contract to the subject with which it deals; and if by reason of some collateral matter an ambiguity then appears, proof of the facts and circumstances under which the agreement was made is admissible, in order that the language used in the contract may be read in the light thereof for the purpose of ascertaining the true intention of the parties as expressed in the agreement." Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, 1005.

Appellant relies upon certain letters which it says constituted the written contract between the parties. On May 6, 1935, appellee wrote Thomason as follows: "In case the gravel deal with either Gifford-Hill or S. & G. Company goes through I agree to accept 10% commission for any help I am able to give in connection with making the deal or in handling the property after the lease is let. The Commission to be paid as the funds are received by the National Life Insurance Company from the lease contract." On October 11, 1935, Thomason wrote appellee as follows: "Replying to your recent inquiry, wish to advise that our understanding with reference to your commission in connection with the recent gravel contract we have let on the Camp farm reads as follows: 'We are to pay you 10% commission. The commission to be paid as the funds are received by the National Life Insurance Company from the gravel contract. You are also to render any help we call on you for in connection with the making of the deal or handling, the property after the lease is let.'" We do not think it is necessary to set forth other written communications passing between the parties. Appellee testified that after his verbal agreements, that is, the agreement for a commission of fifteen per cent and his subsequent agreement to reduce his commissions to ten per cent by reason of the favorable lease contract which was about to be entered into with Gifford-Hill & Company, he wrote Thomason the letter of May 5, 1935, because: "I knew that a lease of at least ten years and the amount of money that I was to receive, that possibly either he or myself might die, or get transferred or something—he might be transferred and there might be some misunderstanding as to what I was to receive, and I asked that he verify our agreement by letter and he said he would be glad to do it. I waited sometime before it was verified, and I think I called him or wired him or something, and then he did give me a letter to verify the fact that I was to receive ten per cent."

■ We cannot say as a matter of law that the language employed in the letters before us was such as to require the courts to presume conclusively that the same embraced and expressed the entire agreement between the parties. Appellee's verbal testimony as to the terms of the contract sued upon and his explanation as to why the letters were written is not necessarily inconsistent with the language actually used in such letters. Under the evidence as a whole we think reasonable minds might differ as to what was meant by the expression "gravel deal", or "help in making the deal", or "handling the property after the lease is let", as contained in the letters. But if such expressions and the amount of the commissions to be paid for the intended services related conclusively and solely to the lease contract with Gifford-Hill & Company, then what was the intention of the parties in the event such lease be merged into a contract of sale, and why was the lease so merged? By reason of the latent ambiguity which arises in thus applying the letters to the subject matter with which they purport to deal, we are of the opinion that parol evidence was admissible to aid in making the application. First Nat. Bank v. Rush, Tex.Com.App., 210 S.W. 531; Blake v. Pure Oil Co., 128 Tex. 536, 100 S.W.2d 1009; Jasper State Bank v. Goodrich, error dismissed Tex.Civ.App., 107 S.W.2d 600. Without further discussion we hold that the competent evidence of probative force in this case was sufficient to raise and sustain the ultimate fact issues found by the jury. Texas Creosoting Co. v. Sims, error dismissed Tex.Civ, App., 113 S.W.2d 227.

Finding no reversible error under any of the points or assignments presented by appellant, the judgment of the trial court is affirmed.

## On Appellant's Motion for Rehearing and for Findings of Fact.

HALE, Justice.

In appellant's motion for rehearing and request for additional findings of fact, it insists this court erred in holding that on or about September 8, 1938, "the lease contract was merged into and terminated by a comprehensive written contract of sale between the parties." Appellant says "the record shows that the lease to Gifford-Hill & Company and the purchase of the property outright by it were entirely separate and distinct transactions." We cannot agree with this contention.

The lease contract contained a detailed schedule of the royalties to be paid by lessee to lessor for each cubic yard of sand, gravel or ballast to be mined and removed from the leased premises during the term thereof. It also provided that Gifford-Hill & Company should have the privilege of terminating the contract "upon giving sixty days written notice in advance of such intention to abandon said lease." On September 5, 1938, Gifford-Hill & Company wrote appellant that "we are cancelling our lease contract dated May 27, 1935, in Robertson County." However, only three days after that date, on to-wit, September 8, 1938, appellant and Gifford-Hill & Company signed the written contract of sale which had been in process of negotiation for some time. By the terms of the contract of sale appellant reserved a one-fourth interest in and to all oil, gas or other minerals under said land, including one-fourth of the sand, gravel and ballast in place. The sales contract and the deed of conveyance executed thereunder each provided that Gifford-Hill & Company was to pay appellant for its reserved one-fourth of the sand, gravel and ballast to be mined and removed from the premises conveyed in accordance with the detailed schedule of royalties contained in the original lease agreement; that after $5,000 was paid to appellant under the royalty reservation, Gifford-Hill & Company would be allowed to take credit for the next $5,000 in royalty against advance royalty payments it had theretofore made to appellant under the prior lease, and after such credit was exhausted, royalty payments to appellant would again be resumed. The sales contract also provided that on its completion "the Gravel Contract entered into between the National Life Insurance Company and Gifford-Hill & Company on the 27th day of May, 1935, covering the lands herein contracted to be sold, shall immediately become null and void and of no further force and both parties shall be relieved from any further liability thereunder."

■ We think it is clear from the evidence as a whole that the sale and conveyance of the Camp farm from appellant to Gifford-Hill & Company originated in and grew directly out of the original lease contract. The purpose of appellant in seeking and securing the services of appellee was to realize upon the increased potential value of its farm as a gravel project. This purpose was partially achieved when the lease contract was signed and it was ripened into further maturity when the lease contract was later merged into and terminated by the sale of the land. By the terms of the sales contract the parties agreed, in effect, upon the cash commuted value of three-fourths of the sand and gravel in place, and continued in force the original lease contract in a modified form in so far as the same related to the one-fourth interest retained by appellant. The fact that appellant did not see fit to request the aid of appellee in merging its lease contract into the later contract of sale did not militate against the lawful right of appellee to be compensated for his services in accordance with the provisions of his contract of employment.

We have concluded that appellant's motion for rehearing must be overruled.

RICE, Chief Justice (dissenting).

Being unable to concur with the majority opinion, I respectfully dissent therefrom.

In my opinion, the evidence in this cause, viewed most favorably from plaintiff's standpoint, and if admissible in its entirety, establishes that plaintiff had a verbal contract with defendant binding the latter to pay plaintiff a commission of ten per cent on the amount received by it if plaintiff were the procuring cause of the sale of the gravel on its Camp farm; that subsequently, and because of plaintiff's efforts, Gifford-Hill executed with defendant the gravel lease dated May 27, 1935, and described in the court's opinion. In this lease it was provided that lessee could, on sixty days' written notice to lessor, cancel all of its obligations thereunder. In the fall of 1938, Gifford-Hill exercised this contractual right and terminated its obligation to defendant. Since no issue

of fraud or collusion was submitted to the jury, plaintiff's pleaded contention of fraud in the cancellation of the gravel lease and the subsequent sale of the land must be deemed to have been waived. The cancellation of the gravel lease by Gifford-Hill, and the subsequent sale of the land by defendant to Gifford-Hill, must each therefore be accepted by us as having been done in good faith.

There was, I think, neither pleading nor proof that it was ever contemplated by plaintiff and defendant at the time the gravel lease was being negotiated that it might eventually ripen into a sale by lessor to lessee of the land therein described, and that in such event plaintiff would receive a commission on the sale price; nor was there pleading or proof that it was within the contemplation of defendant and Gifford-Hill, prior to or at the time of the execution of the gravel lease, that the lease might later be expanded into a sale of the land. No option to purchase the land was given Gifford-Hill by the terms of the lease agreement.

It therefore follows, in my opinion, that the subject matter of the verbal contract entered into by plaintiff and defendant was finally and fully concluded when plaintiff brought defendant and Gifford-Hill together and the gravel lease resulted. The execution of the lease fixed and determined the right of plaintiff, under the pleaded contract, to receive, as well as the defendant's obligation to pay, a commission of 10 per cent of the amount collected by defendant under the contract. When this contract was legally terminated by Gifford-Hill by the exercise of its right to cancel, the legal liability of defendant to pay plaintiff a commission of 10 per cent of the amount received thereunder was likewise terminated and their verbal contract was fully concluded.

Plaintiff does not contend that he did anything after the gravel lease was executed to induce Gifford-Hill to buy the land in question. As I understand plaintiff's claim, it is that he brought defendant and Gifford-Hill together, that the gravel lease resulted, and thereafter, and because of plaintiff's original efforts in bringing the parties together, the sale of the land resulted. When the gravel lease was terminated by Gifford-Hill, I do not believe that the record before me reveals in the pleadings or the evidence that any such continuing contractual relationship existed between plaintiff and defendant; nor do I believe that the cancellation of the gravel lease, more than three years after its date, re-vitalized the original verbal contract between plaintiff and defendant which was concluded and consummated upon the execution of the gravel lease.

The majority opinion has clearly, correctly and concisely stated and discussed the rules of evidence in respect to the admissibility of parol evidence tending to explain, modify or vary the terms of a written contract; but I have grave doubt that the court correctly applied these rules to the facts of this case.

Plaintiff testified that prior to the execution of the gravel lease in question, he had an oral agreement with defendant's agent that he was to receive for his services 15% from any money that was derived from the sale of sand and gravel from the Camp farm; that before the gravel lease was executed he verbally agreed, at the agent's request, to reduce the compensation to 10%; that after this, and because the lease was of long duration, and to prevent any misunderstanding of what he was to receive, he asked the defendant's agent to verify their agreement by letter and this the agent promised to do; that after waiting for some time he called or wired the agent and received a letter from him verifying that plaintiff was entitled to receive a 10% commission. The following letters were introduced in evidence:

"Hearne, Texas
1-11-35

Mr. Neil Thomason,
204 Const. Bldg.,
Dallas, Texas.
Dear Mr. Thompson—

Confirming our conversation concerning gravel lease near Hearne.

The Gifford-Hill people should be in to see you in the very near future for a testing optional contract. I believe 30 days should give them ample time to make proper investigation and if contract accepted, 60 days to begin operations or start paying guarantee monthly payments.

After making some investigations it might be their desire to impose on contract by paying minimum guarantee and probably not work your property for some time. And in which event my agreement with you on the one cent overriding royalty would leave me out, unless they actually removed material. In above event I be-

lieve you will agree that I would be entitled to a per cent equal to royalty basis in event they exercised their minimum guarantee. Which if you received 7¢ per cubic yard would be 1/7 or if 10¢ can be secured would be 1/10.

If you are not able to deal with the Gifford-Hill people soon please advise and I will direct some one else. However would suggest the Gifford people your best bet. If in any way you might need my assistance in Dallas please advise.

Yours very truly
(Signed) Lyman W. Perkins

P. S. Please advise your opinion on 'minimum guarantee percent basis' as outlined in letter.

L. W. P."

"Hearne, Texas,
April 18, 1935

Mr. Neil Thomason,
Construction Bldg.,
Dallas, Texas.
Dear Mr. Thomason—

Enclosing three Sand & Gravel leases. Please note the paragraphs marked with blue pencil which have proven to be very useful to the lessor. However in some instances the amounts should be changed. I believe if you familiarize yourself with all three agreements that you will have in mind most everything that you will be confronted with.

Would appreciate when you finished with enclosed papers to please return for my file.

Hoping this may be of some benefit, and if anything else that I may assist you will be very glad to do so.

Yours very truly,
(Signed) Lyman W. Perkins."

"May 6, 1935

National Life Ins. Co.
Dallas, Texas.
Re: Camp #1298
Gentlemen:

In case the gravel deal with either Gifford-Hill or S & G Company goes through I agree to accept 10% commission for any help I am able to give in connection with making the deal or in handling the property after the lease is let.

The commission to be paid as the funds are received by the National Life Insurance Company from the lease contract.

Very truly yours,
(Signed) Lyman W. Perkins."

"Dallas, Texas,
Oct. 11, 1935.

Mr. Lyman Perkins,
Hearne, Texas.
Re: Camp #1298
Dear Sir:

Replying to your recent inquiry, wish to advise that our understanding with reference to your commission in connection with the recent gravel contract we have let on the Camp farm reads as follows:

We are to pay you 10% commission. The commission to be paid as the funds are received by the National Life Insurance Company from the gravel contract. You are also to render any help we call on you for in connection with the making of the deal or handling the property after the lease is let.

Very truly yours,
(Signed) Neil Thomason,
Manager."

This court has held that the letter dated October 11, 1935, and above set out, from Thomason to plaintiff, is sufficiently ambiguous to render parol evidence in explanation thereof admissible. In this I think the court is in error.

Plaintiff's plea of fraud was waived because not submitted; there was no plea of accident, mistake or ambiguity. Plaintiff, although a witness, was not asked to explain, and in my opinion, gave no testimony tending to explain the meaning of the term "handling the property after the lease is let." Plaintiff's counsel did, however, bring out from Thomason that part of plaintiff's duties in respect to this gravel lease with Gifford-Hill was that, in event said company began operating under the lease, Perkins was to keep a check on the gravel. Perkins did not deny this; nor did he testify that he rendered any character of assistance in respect to the property after the lease was let.

Perkins himself, by his letter of May 6th, put the contract under consideration in its written form and it will be construed most strongly against him. If there is an ambiguity in the contract, it arises from the words employed by Perkins in reducing the contract to writing, and he should not be allowed to profit by reason of an ambiguity for which he is responsible. 17 C.J.S. Contracts, page 751, §§ 323, 324; 10 Tex.Jur. 277, sec. 162.

I am of the opinion that when the letter dated October 11th is read in connection with the letter dated May 6, 1935, there can be no doubt of the meaning of the expression "gravel deal," "help in making the deal," and "handling the property after the lease is let," held by this court to create the ambiguity in the letter from Thomason to plaintiff under date October 11, 1935. If any doubt remained as to the meaning of the expressions above quoted, after reading in connection with each other the letters dated May 5th and October 11th, 1935, such doubt would be dispelled, I think, by referring to plaintiff's letter to Thomason dated January 11, 1935, the opening sentence of which is: "Confirming our conversation concerning gravel lease near Hearne"; and to the letter from plaintiff to Thomason under date April 18, 1935, enclosing sand and gravel leases.

Each of the above-quoted letters from plaintiff to Thomason shows, without any uncertainty, that plaintiff had in mind a gravel lease, and not a sale of the property, and that he and Thomason were both referring to the Gifford-Hill gravel lease in the letters respecting plaintiff's commission. This being so, their prior oral understandings were merged into the written contract constituted by their letters, and the parol evidence varying and enlarging the terms thereof was erroneously admitted.

The facts of this case, in my opinion, bring it within the rule established by the settled law of this State that "in the case of a valid contract, all prior negotiations that the parties may have had, previous to the execution of the contract, must be considered as either waived or as merged into the written contract. By a valid and enforceable contract is meant such a contract that is neither void on its face, nor voidable because of fraud inducing its execution. In a suit to enforce such a contract, neither party can go behind its terms, to ingraft on it other terms not specifically, or by clear implication, contained therein; for there is a rule of law, as old as our jurisprudence, that extrinsic evidence cannot be received to vary the terms of a valid contract." Distributors Inv. Co. v. Patton, 130 Tex. 449, 110 S.W.2d 47, 48; Remington-Rand, Inc., v. Sugarland Industries, 137 Tex. 409, 153 S.W.2d 477; Avery Co. of Texas v. Harrison Co., Tex.Com.App., 267 S.W. 254.

I am further of the opinion that when Gifford-Hill terminated the gravel lease by exercising the right to terminate expressly retained therein, and thereafter, or simultaneously therewith, entered into a contract with defendant to buy the land described in the gravel contract, this did not, as held in the majority opinion, constitute a merger of the lease contract with the contract of sale. When the lease contract was terminated there was nothing left to merge—the lease, and all rights thereunder, was at an end. Gifford-Hill had the right to terminate the lease, and it likewise had the right, with defendant's acquiescence, to purchase the land originally covered by the lease. In the absence of fraud, I fail to see how the exercise of these two rights, the striking down of the lease with one hand, the purchase of the land with the other, could be held to be a merger of the lease so stricken with the contract of sale which came into being after or contemporaneously with the termination of the lease.

Because of the views above expressed, I am of the opinion that the motion for rehearing should be granted and that this cause should be reversed and rendered.