**HOME INDEMNITY COMPANY, Appellant,**

**v.**

**William M. DRAPER et al., Appellees.**

**No. 16209.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Nov. 23, 1973.

Rehearing Denied Jan. 10, 1974.

Boswell, O'Toole, Davis & Pickering, John H. Boswell, Houston, for appellant.

Jamail & Gano, Joseph D. Jamail, John Gano, Don M. Barnett, Houston, for appellee William M. Draper.

Quinnan H. Hodges, Houston, for appellee Transport Ins. Co.

EVANS, Justice.

In this Workmen's Compensation case, it was stipulated that appellee Draper was totally and permanently incapacitated while in the course and scope of his employment and that he was entitled to maximum Workmen's Compensation benefits. The trial court entered judgment for Draper against appellant, Home Indemnity Company, for the unpaid lump sum of compensation benefits, for unpaid medical expenses and an additional sum for nursing care services. We affirm the trial court's judgment.

There were two issues submitted to the jury:

### Special Issue No. 1

"What do you find from a preponderance of the evidence to be the reasonable cost of the services rendered for William Draper for his reasonably required nursing care from the date of his injury to the present.

"You are instructed that the term 'nursing care', as used above, includes all those services, if any, performed by Mrs. Draper as required by Mr. Draper's condition resulting from the injury in question.

"Answer in dollars and cents, if any.

"Answer: $84,675.00

### Special Issue No. 2

"Do you find from a preponderance of the evidence that at the time of the accident resulting in the injuries to William M. Draper on December 30th, 1969, said William M. Draper was a borrowed employee of Earl Gibbon Transport, Inc.?

"A 'borrowed employee' is one who, while in the general employment of one employer, is subject to the right of another employer or his agents to direct

and control the details of the particular work inquired about, and is not merely co-operating with suggestions of such other employer.

"Answer 'We do' or 'We do not'.

"Answer: <u>We do not</u> "

In twenty-six points of error Home Indemnity Company complains that there is no evidence and insufficient evidence to support the jury's answer to Special Issue No. 1; that the jury's finding to such issue is excessive and against the great weight and preponderance of the evidence; that the form of such issue as submitted is erroneous and that the court erred in permitting appellee to file trial amendment on its claim for nursing services; that the trial court also erred in the admission of testimony as to the bases for valuation of such nursing services; that Draper, as a matter of law, was the borrowed employee of another company at the time of the accident and that the jury's finding to Special Issue No. 2 was against the great weight and preponderance of the evidence; that testimony on that issue had been erroneously admitted, and that the trial court committed error in commenting upon the weight of the evidence.

Draper was a general employee of Can Go Corporation and employed by that company as a truck driver. Can Go and Earl Gibbon Transport Company, Inc., an interstate carrier, had entered into a "trip lease" or "interline" agreement to enable Can Go trucks to be operated in the State of Louisiana. The point of interchange of equipment was Liberty, Texas, and in December, 1969, a Can Go truck was driven by Draper from Texas City, Texas, destined for Abbeville, Louisiana. Draper stopped enroute at Liberty, Texas, to execute the interchange agreement as a requirement before proceeding into Louisiana, and after leaving Liberty, Texas, was involved in the accident near Crowley, Louisiana. Home was the Workmen's Compensation carrier for Can Go and Transport Insurance Company was the Workmen's Compensation carrier for Gibbon at the time of Draper's accident.

Home first contends that there is no evidence of Draper's condition and medical needs during the period from the taking of his deposition on June 17, 1972, and the date of trial; therefore, it contends no showing was made that Draper was in need of nursing services at any time after June 17, 1972. We cannot agree.

■ Home stipulated that Draper was totally and permanently incapacitated and the testimony shows without contradiction that he was a quadriplegic, paralyzed and without use of his legs and arms except for partial limited use of one arm, and that he required continuous supervision and care, day and night. Draper's testimony at the time of his deposition was as follows:

" . . . I have no use of my legs, no use of my left arm or hand, and partial use of my right arm. And I still don't have full control over it, I drop things, and I can't do anything. I can't even shave myself. I have to have help eating. I have lots of infections always . . . You know, I have a lot of trouble with my bladder. I have no movement of my legs or anything."

Draper must have a catheter tube for urination; he has bladder spasms; he can't bathe himself or move himself or go to the bathroom or dress himself; he cannot exercise himself or move his wheelchair or even button his shirt. He further testified that there had been no improvement in his condition and that the pattern of his life had developed so that he had somebody staying with him all of the time. Appellant's claim supervisor testified he had met Draper on one occasion in 1972 and that Draper was then paralyzed in both legs and had only minimal use of his right hand and arm. The supervisor further admitted:

"Q Your insurance company is not contending there has been any change in his condition are you?

"A No, sir.

"Q Sir?

"A No, sir."

Under the circumstances the jury was at liberty to infer from the evidence presented that the incapacity of Draper continued up until the time of trial. See Traders & General Insurance Co. v. Hunter, 95 S.W. 2d 158 (Tex.Civ.App.—Amarillo 1936, writ dism'd); National Surety Company v. Landers, 235 S.W. 275 (Tex.Civ.App.—Texarkana 1921, writ dism'd); McCormick & Ray, Texas Law of Evidence, Vol. 1, Sec. 81, p. 81 et seq.

■ Home next argues that there was no evidence of the reasonable cost of the nursing services rendered by Mrs. Draper.

We find there was evidence on this point. Dr. Bar Sela, Chief of the Department of Physical Medicine and Rehabilitation at St. Joseph Hospital in Houston, testified on behalf of appellee. Dr. Bar Sela specializes in physical medicine and rehabilitation and deals with problems of chronic disabling injuries, loss of function and other matters requiring physical rehabilitative efforts. Dr. Bar Sela had never examined Draper but had treated people with similar disabilities, whom he said were classified medically as quadriplegics. He further testified that he was familiar with the care necessary to sustain such disabled persons and that nursing care was mandatory because the individual could not care for his own basic needs. He said that such disabled persons needed care to help them feed themselves; turn themselves so they would not get bed sores or ulcers; bathe them and assist in urination and defecation. He said it is not possible for a quadriplegic to keep himself clean and that it was necessary to have a person to care for him and to keep him clean. He said a person with disability such as Draper's requires "somebody trained in the management of such a person" who could be in attendance within calling distance so that they could be turned every two or three hours and who could look at the patient and inspect him "because he couldn't tell you if he defecated or urinated involuntarily." Dr. Bar Sela further testified that this type of care required somebody trained to do the job "usually a nurse or aid." Dr. Bar Sela then testified that "give or take a few dollars" the cost of hiring a licensed vocational nurse (LVN) was about $28.00 for an eight hour shift in the State of Texas. He was then asked:

"Q Is the figure $28.00 generally the figure?

"A That is the one used in most hospitals, if you require a LVN and are looking for special care on a patient in an eight hour shift it will be $28.00. That is what the charge is at St. Josephs.

"Q That would be generally true in El Paso, Texas, as well as the rest of Texas?

"A Give or take a few dollars.

"Q Doctor, we need to know what the few dollars is, is that per month?

"A Even per day. You are talking about a wide range of training. There are LVNs that are just as good as any nurse around and they will charge more and there are those that charge a little less. You can always find one that will come for twenty-five dollars a shift possibly twenty-two dollars.

"Q Is that about the minimum?

"A Just about I am afraid.

"Q Would that be a person who was competent to watch over somebody?

"A We are speaking of somebody with a little bit of training, yes.

"Q Would this be the kind of help that a quadriplegic such as Mr. Draper would need and require?

"A Yes.

"Q In your opinion, based on your past training and education and experience in your specialized field is this type of help necessary?

"A It is mandatory. You can't get by without it.

"Q All of the figures you have given us in your testimony is based on your medical experience and training?

"A Very much so."

There was further testimony that it is part of the Texas Rehabilitation Department's program to teach the wife how to take care of her husband after he was released and permitted to go home and that Mrs. Draper had received some degree of instruction from the hospital as to the handling of her husband after she got home. The testimony clearly established that Draper's wife was capable of doing all of the things for Draper which he could not do for himself, and the jury was justified in concluding from this evidence that Draper's wife was performing the duties of a full-time nurse for him.

■ Home acknowledges that a recovery may be had for nursing services rendered by a wife to her injured husband. Western Alliance Insurance Co. v. Tubbs, 400 S.W.2d 850 (Tex.Civ.App.—Waco 1966, writ ref'd, n.r.e.); Transport Ins. Co. v. Polk, 400 S.W.2d 881 (Tex.Sup.1966). However, Home argues that the evidence failed to establish the reasonable cost of the nursing service rendered by Mrs. Draper in this case. Home contends that since Mrs. Draper was not qualified as an LVN, the testimony as to the basis for compensation of an LVN was not competent evidence from which the jury could determine a reasonable compensation for the services rendered by Mrs. Draper.

Dr. Bar Sela testified that an LVN generally was paid $28.00 for an eight hour shift in the City of Houston and that such figure would be within a "few dollars" of similar pay for an LVN throughout the State. He further testified that $22.00 was about the minimum pay scale for "a person who was competent to watch over somebody" and who had "a little bit of training." The jury's verdict, while rendered in a lump sum, would compute to a figure of $25.00 per eight hour shift for the time period in question. We hold that the jury was at liberty to infer from the evidence that Mrs. Draper was performing substantially all of the services which a qualified vocational nurse would have performed for a person having disability similar to that of her husband and we do not find from the record that the jury's verdict is excessive or against the great weight and preponderance of the evidence. We overrule appellant's points 1 through 7.

■ Home further argues that the trial court erred in permitting Dr. Bar Sela to testify as to the pay scale for an LVN in the State of Texas and in the City of El Paso, Texas, claiming that the evidence did not reflect that Dr. Bar Sela had been shown to have any personal knowledge of such matters. Home similarly argues that the trial court erred in permitting Dr. Bar Sela to testify that Draper required three nurses for each twenty-four hour period of time, claiming that Dr. Bar Sela had never examined Draper and could not testify to this necessity from personal knowledge. We have carefully reviewed the record on these matters and find that the trial court did not err in admitting this testimony. Further, we are of the opinion that Home's objections thereto were of a nature which were not preserved in the absence of appropriate motions to strike. See Hogsett v. Northern Texas Traction Co., 55 Tex.Civ.App. 72, 118 S.W. 807 (1909, writ ref'd). Appellant's points of error 8 and 9 are overruled.

■ Home further objects to the submission of Special Issue No. 1 claiming that same constitutes a comment on the weight of the evidence and contends that its requested Special Issues 1, 2 and alternately thereto 2–A should have been sub-

**576**

mitted in lieu of the submitted Special Issue No. 1. Appellant also contends that the trial court erred in refusing its Special Issue No. 3 and alternatively 3–A and its requested Special Issue No. 4, all of which such special issues pertain to the nursing care matter. Home argues that Special Issue No. 1, as submitted, constitutes a comment on the weight of the evidence because it presumes that nursing services were rendered on behalf of Draper. Although the fact of nursing services being rendered for Draper was not stipulated, it could hardly be contended that it was a disputed fact in the case. The testimony of Home's claims supervisor and of Draper himself indicates that Mrs. Draper was doing everything for him which a nurse would have done. In view of the undisputed nature of Draper's total and permanent incapacity and of the testimony evidencing the twenty-four hour care which a quadriplegic similarly situated required, we believe the trial court was justified in assuming as an uncontroverted fact, that nursing care and treatment were rendered for Draper as shown by the testimony. Rule 272, Texas Rules of Civil Procedure; American Pozzolan Corporation v. Desert Trucking Company, 450 S.W.2d 433 (writ ref'd, n.r.e.); see also Wright v. Vernon Compress Company, 156 Tex. 474, 296 S. W.2d 517. We find that the court's charge was not an objectionable comment on the weight of the evidence. Dillingham v. Currie, 92 S.W.2d 1122 (writ dism'd).

It was also undisputed that Home had never furnished any nursing services to Draper at any time prior to the date of trial. On that point Home's claims supervisor testified that none of the payment made to Draper included any payment for nursing services.

"Q None of that has been paid for the nursing services that Mrs. Draper had performed, has it?

"A No, sir.

"Q None has been paid to her or Mr. Draper for the services she performed?

"A No, sir."

We are of the opinion, therefore, that the trial court did not err in refusing to submit appellant's requested Special Issues 2 and alternatively 2–A. We overrule Home's Point Number Twelve.

Home further contends that the trial court erred in refusing its requested Special Issue No. 3, alternatively its requested Special Issue No. 3–A, and its requested Special Issue No. 4, which inquire as to whether a preponderance of the evidence shows that Draper "expended or incurred" any amount for reasonably required nursing services which Home failed to furnish in a reasonable time and the reasonable cost of such services. The form of these issues requested by Home does not, in our opinion, comport with the facts of this case. It was undisputed that Draper's wife was entirely responsible for nursing services rendered to him and it was never contended that expenses of an outside nurse were expended or incurred. The issues requested by Home tend to mislead because they indicate that Draper must have actually expended some money or incurred some debt for his nursing services. That is not the case here. We overrule Home's Points Thirteen and Fourteen.

Home next contends that the trial court erred in overruling its objections to Special Issue No. 1 for the reason that there were no pleadings for the recovery of nursing services and that the trial court erred in permitting Draper to file trial amendment on the second day of trial seeking, Home contends, recovery for nursing services for the first time. We overrule both Points Fifteen and Sixteen.

Draper's original answer and cross-action asserts he is entitled to recover $49.00 per week for 401 weeks for his injuries and disability and medical benefits under Section 7, Art. 8306, Vernon's Ann.Civ.St., as provided by the Workmen's Compensation Act. That section provides:

"The association shall furnish such medical aid, hospital services, nursing,

chiropractic services, and medicines that may reasonably be required at the time of the injury and at any time thereafter. . . ."

No special exception was levied at this pleading and the voir dire examination reflects that the attorneys for the parties were fully aware of Draper's claim for nursing services. It was not until the opening of evidence on the second day of trial that Home objected to the issue of nursing services as not being raised by the pleadings. Home did not seek continuance nor did it attempt to withdraw its announcement of ready, and on the record before us we cannot say the trial court abused its discretion in granting Draper leave to file trial amendment and in admitting evidence on the nursing services issue. Rule 66, Texas Rules of Civil Procedure. The burden of convincing the trial court that the filing of the trial amendment was prejudicial rested upon Home. This burden was not met in the trial court and in the absence of request by Home for delay, there is no basis for review by this court. See McDonald, Texas Civil Practice, rev. ed. 1970, Vol. 2, Sec. 8.07, p. 334; Herrin Transportation Company v. Parker, 425 S. W.2d 876 (Tex.Civ.App.—Houston 1968, writ ref. n.r.e.).

Home's next points, Seventeen through Nineteen, complain that the jury's finding that Draper was not a borrowed employee of Gibbon is against the great weight and preponderance of the evidence and that such borrowed employee relationship was established as a matter of law. Home's points Twenty through Twenty-two are related in that they complain that the trial court erred in the admission of certain testimony which was at variance with the terms of the trip lease agreement and therefore violated the parol evidence rule.

In Producers Chemical Co. v. McKay, 366 S.W.2d 220, 225 (Tex.Sup.1963), Chief Justice Calvert said:

"Whether general employees of one employer have, in a given situation, become special or borrowed employees of another employer is often a difficult question, particularly when employees are furnished with machinery by their general employer to accomplish part of a project or contract undertaken by another. Solution of the question rests in right of control of the manner in which the employees perform the services necessary to accomplishment of their ultimate obligation . . .

" . . . .

"When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple. As examples, see Magnolia Petroleum Co. v. Francis, Tex.Civ. App., 169 S.W.2d 286, writ refused; Steele v. Wells, Tex.Civ.App., 134 S.W.2d 377, writ refused. It is when the contract between the employers is only implied or contains no provision for right of control that the problem becomes difficult. In such cases right of control is necessarily determined as an inference from such facts and circumstances as the nature of the general project, the nature of the work to be performed by the machinery and employees furnished, length of the special employment, the type of machinery furnished, acts representing an exercise of actual control, the right to substitute another operator of the machine, etc. . . ."

Home relies heavily on United States Fire Ins. Co. v. Warden, 471 S.W.2d 425 (Tex.Civ.App.—Eastland 1971, writ ref'd n. r. e.), which involved a contract and factual situation similar to those in this case. Warden's general employer, as lessor, had entered into a lease agreement with an interstate carrier, as lessee, which placed the lessor's truck under the direction and control of the lessee. The driver, Warden, died as a result of an accident occurring while he was hauling a load of furniture under the lease agreement. The terms of the Warden lease contract are similar to those in the lease agreement un-

der consideration in that they provide that the leased vehicles are to be "under the direction and control of" the lessee and that the lessee assumes full responsibility to the public, the shippers, and to the regulatory authorities with respect to the equipment; however, they are dissimilar in that in Warden the lessor agreed to provide drivers and assistants for the vehicles, to pay their wages and taxes imposed thereon, as well as Workmen's Compensation insurance covering the drivers "while operating in the lessee's service," and in Warden the lessee had the right to hire and discharge the drivers and assistants. The contract in the record before us certainly gives no right to the lessee to either hire or fire the contract, it purports simply to lease the equipment and does not expressly provide who is to have right of control over the driver. See Brown v. Missouri Lumber Transports, Inc., 456 S.W.2d 306, 313 (Mo.Supp.1970), wherein the subjection of the equipment and operator to I.C.C. regulations under a trip lease agreement was held to be merely one factor bearing on the issue of control.

In Warden it was held that parol evidence was inadmissible to show the opinion of the lessor that its lessee, the interstate carrier, did not have the right to hire or discharge the lessor's drivers since the express provisions of the contract directly provided to the contrary. The court in the Warden case, in effect, found there was no uncertainty in the meaning of the contract which would permit an interpretation contrary to its express provisions.

 In the contract before us there are no express provisions dealing with the right of control of the vehicle drivers in the performance of their services and we are of the opinion that parol evidence was admissible to assist in the determination of the parties' agreement on this point. Where a writing is incomplete, uncertain or ambiguous parol evidence is admissible to explain the writing or to assist in the ascertainment of the true intention of the parties, insofar as that intention is consist-

ent with the express provisions of the writing. National Life Ins. Co. v. Perkins, 170 S.W.2d 539 (Tex.Civ.App.—Waco 1943, error ref'd). As concisely stated in McCormick and Ray, Texas Evidence, Vol. 2, Sec. 1611, at p. 452:

> "A document may embody part of the dealings between the parties and touch lightly, if at all, on other elements of the same transaction. The effect of such a writing should be consonant with its scope; only such extrinsic evidence as varies or adds to the terms of the particular phase covered by the writing is to be excluded."

Draper testified that he was always employed by Can Go, who paid his salary and took out his withholding and Social Security and that from the time he took on his load in Baytown he was following the oral instructions of his employer Can Go and took no orders from Gibbon or anyone else. He said his superiors at Can Go told him what load to take, what unit to drive and where to go. He said after leaving Liberty, Texas, he was still following the oral instructions of Can Go and that he would not follow any instructions from Gibbon unless Can Go told him to do so. Upon reaching Liberty, Texas, in the middle of the night, Draper followed a check-in procedure, which Gibbon had authorized, of filling out his driver's log, then utilizing a rubber stamp made available for that purpose, stamped the signature of Gibbon's agent on the agreement, signed his name and deposited Gibbon's copies in the agent's locked mail box. On such occasion and throughout the remainder of his trip, Draper had no personal or telephone contact with anyone from Gibbon. Draper testified that after leaving Liberty, Texas, he was still following the oral instructions of Can Go and that he would not have followed instructions from Gibbon unless Can Go told him to do so. The President of Can Go testified that the sole purpose for the execution of the trip lease agreement was to permit Can Go to secure operating rights in Louisana because the Interstate

Commerce Commission required such a contract before the Can Go truck could go into interstate commerce; that Draper was Can Go's employee throughout the trip and that Can Go never ceded nor intended to cede to Gibbon its right of control of Draper. It is clear from the testimony of both Can Go's and Gibbon's officers and employees that the trip lease agreement was considered a mere formality which they knew must be executed if they were to legally operate under the regulations of the Interstate Commerce Commission. This testimony shows without material contradiction that Gibbon never exercised nor sought to exercise any control over Can Go's employees and that Gibbon's only concern and responsibility under the lease agreement was to check to see that the agreement was signed, that the vehicle was in good operating condition and was identified with a Gibbon's sign and that the Can Go driver had sufficient available time on his log book to complete the trip, all as required by the regulations. The facts in this case are basically distinguishable from Warden, because in Warden the lessee actively assumed the entire responsibility of directing the driver from point of departure to point of destination, and such responsibility was exercised without the involvement of the lessor, Warden's general employer.

■ We are of the opinion that the testimony in this case shows that actual "exercise of control" of Draper was never relinquished by Can Go, but on the contrary was retained by Can Go throughout the trip and up until the time of the accident. We believe the testimony was fully admissible as bearing upon the "right of control" and as evidence of the parties' treatment of the trip lease agreement as a mere paper formality. Newspapers, Inc. v. Love, 380 S.W.2d 582 (Tex.Supp.1964); Producers Chemical Co. v. McKay, supra; Halliburton v. Texas Indemnity Inc., 147 Tex. 133, 213 S.W.2d 677 (1948). See also Lone Star Gas Co. v. X-ray Gas Co., 139 Tex. 546, 164 S.W.2d 504, 508 (1942), wherein Justice Sharp said:

" . . . If there is any doubt as to the meaning of a contract like the one before us, the courts may consider the interpretation placed upon it by the parties themselves. In this instance the acts of the parties themselves indicated the construction they mutually placed upon the contract at the time, including the acts done in its performance, and same is entitled to great if not controlling weight. Courts will generally follow the interpretation of the parties to a doubtful contract. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention that whatever was done by them in the performance of the contract was done under its terms as they understood and intended same should be done . . . "

■ Inasmuch as the contract in question was silent on the subject of right of control over the driver, the parol testimony of the parties showing clearly and positively their construction of their agreement was properly admitted. Godwin v. Roberts, 213 S.W.2d 571 (Tex.Civ.App.—Galveston 1948, writ ref'd n. r. e.); see also Universal C.I.T. Credit Corportation v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951). Since we have determined the testimony was properly admitted, we need not discuss whether there was a waiver of objection to such testimony and whether Home was in position to complain of its admission. For the reasons stated we overrule Home's Points of Error Seven through Twenty-two.

■ Home further complains that the trial court erred in permitting Draper to testify, over objection, that he had no employer other than Can Go in November and December of 1969, and that after leaving Liberty, Texas he knew and understood he was still working and taking orders from Can Go; in permitting the President of Can Go to testify that Draper was

Can Go's employee during the whole trip, that he never contemplated as President of Can Go that the control of Can Go drivers should ever pass to Gibbon while they were operating under the certificate of authority in the manner of their performance of their duties as drivers; that the control of the Can Go drivers was never relinquished nor was it ever intended to relinquish control to Gibbon, and that, as President of Can Go, he had an agreement with the manager of Gibbon that Can Go would pay the Workmen's Compensation insurance premiums for drivers of trucks owned by Can Go. We do not regard the testimony of these witnesses as constituting legal conclusions but merely as statements of their own understanding of matters peculiarly within their knowledge. Furthermore, the general scope of this testimony was otherwise developed, without objection, and even if error, we regard the admission of this testimony as harmless error. Rule 434, Texas Rules of Civil Procedure. Home's Points of Error Numbers Twenty-three and Twenty-four are overruled.

We also deny Home's Points of Error Twenty-five and Twenty-six which complain that the trial court erred in making certain statements before the jury which Home contends constituted comments on the weight to be given the trip lease agreement. We have carefully considered the comments referred to by Home and we cannot say that they are of a nature to have prejudiced or misled the jury. No objection was ever made to the court's remarks nor was any motion made to the court for appropriate withdrawal or instructions to the jury. We are of the opinion that any error of the trial court must be deemed waived. Pirrung v. T. & N. O. R. Co., 350 S.W.2d 50 (Tex.Civ.App. —Houston 1961, n. w. h.); McDonald, Texas Civil Practice, Vol. 3, 1970 rev., Sec. 11.20.2, pp. 205–6.

The judgment of the trial court is affirmed.